0572020 Farkas v. Keisler is submitted on the briefs. The next case is 0577400 and others, the International Association of Machinists and Aerospace Workers v. the National Labor Relations Board. Each side will have 20 minutes. Mr. Rosenfeld, on behalf of the Union, I had sent a letter to the Court with respect to my situation at Bolt, and I talked with counsel this morning. Neither of them got that letter, but I advise them of the contents of it. I'm sorry. I lost you. Stand up again. I sent a letter to the — I had a letter delivered to the Court on Wednesday about a recusal issue. I wasn't suggesting it, and I'm — Gee, I don't think I have the letter either. I'm lost. Here are the circumstances. I wrote a letter to the Court advising Judge Fletcher's on the faculty at Bolt. I'm also on the faculty as an adjunct, and I've been there for three years teaching labor law courses. I've had no contact with Judge Fletcher as far as I can remember during the course of my teaching there, but I didn't want a question raised later about some relationship given the fact that technically we have the same university employer. I see. So the question to me is whether I should recuse on that basis. To my recollection, I've never seen you in my life before this morning, and I am now an emeritus professor at Bolt teaching one class per year as an adjunct. And I will not recuse. I hadn't suggested that that was appropriate. But it's worth raising, I understand. Okay. Okay. But I did not see the letter. That happens sometimes at the court's office. I raised it because I didn't want any question. Thank you. Thank you. Your Honor, this is obviously a difficult case for the Petitioner because the Labor Board has made a mess of these bargaining order cases. And every circuit that's looked at bargaining order cases recognizes that the Board has never set out any standards that really one can evaluate, in part because whatever employers do vary from situation to situation, and there's so many variable factors. Most of these cases, however, arise in the context of employer refusals to bargain where employers resist these orders. Are there any cases at all where a court has overturned the Board for refusing to grant a bargaining order? I don't know. Refusing? I don't know. You don't know? I haven't looked. Well, I thought you'd look, because I looked and I can't find a single case where a circuit court has overturned the Board when it's refused to grant a bargaining order. I mean, I would think that would be pretty good precedent if you had such a case. It would be, but the reason that this now arises is because the Board in the last few years has so moved its standards away from granting bargaining orders that it leads to the situation where in this case the Board didn't. I want to try to convince the Court that, like in the cases where the Board orders bargaining, the Board hasn't expressed a rationale that this Court can accept for refusing and asked that the case be remanded. And I want to focus upon the fact that the Board has so moved its standards away from  remanded the Board to explain its rationale for not granting that bargaining order. Isn't there a new case that says the Board doesn't have to give an extraordinary explanation for denying an extraordinary remedy? Not that I'm aware of that changes the Board's obligation to at least explain to some degree its reasons for denying a bargaining order. Well, I'm thinking of a ---- I'm aware that this Circuit issued a bargaining order case involving, I think, the steel workers in Southern California where the union had challenged the bargaining order and the Court found the Board's rationale sufficient. So what's your answer to that? The answer is if I can explain why I think the Board's rationale doesn't meet even its own test, then I think that's the case I've got. So your argument is that prior to the Board change in about 2004, the circumstances of this case would have resulted in a bargaining order as the ALJ recommended. And the ALJ goes through all the findings, which the Board accepts as a factual matter, and you're saying if the Board had not had this change of policy with respect to Gissel II orders, it would have affirmed the or endorsed the adopted the recommendation of the ALJ. And you're saying that it's an abuse of discretion for the Board to have changed its standard. That's the argument. That's only part of it. Part of it, I'm also saying that looking at the findings of the ALJ and the factual record, some of the particular reasons given by the Board for refusing to issue the bargaining order is an abuse of discretion.  Well, let me explain how this arises and what I think the Board in its decision ignores and in large part buries in footnotes like it tends to do. All of this sort of focuses upon March of 2002 when Mr. Galindo, who is admittedly and no one disputes the chief worker, the chief mechanic who's interested in organizing, he's doing all the – most of the organizing in the shop. And prior to March, as the judge describes it, the employer goes on this hunt to find out who it is who's doing the organizing in the shop. And they ask some service advisors. They ask a technician. And they suspect it's Galindo. And just before he's fired sometime in mid-March, they go to him and sort of ask him, what are the problems, which is unlawful. And then on – just before he's fired, they go to another mechanic guy named Pransky and say, isn't Galindo the organizer? And Pransky says yes, and they say, okay, then we'll have to take care of the situation. And they fire him the next day. They fire him the next day. And the ALJ is still found, and the Board agrees. And given that, I don't think I'd be here asking for a bargaining order. But what the Board then says is that given the circumstances, and this is really what they bury in a footnote. It's in the Board's decision in footnote 18. You have Galindo fired. And so we say that has a dramatic impact upon the bargaining unit. This guy's fired. They give a pretextual reason. He's – everybody knows he's the person who supports the union. Yet the Board says in footnote 18, union organizer James Roadhurst testified that three other formerly active union supporters declined to attend a union meeting after Galindo's discharge because they did not want to lose their jobs. The judge found that this testimony demonstrated the impact of Respondent's actions. Well, that's our case. We think, given the fact that Roadhurst says, I had a meeting scheduled two days later, where we expected a large crowd, not only from this dealership but every other dealership. And then Roadhurst says, he talks to the three other kind of team leaders. Roadhurst talks to the three other mechanics who are kind of helping to lead the organizing under Galindo. And they all tell him they're afraid to lose their jobs. They want the organizing effort put on hold. They're not coming to the meeting. The Board says that this testimony that you're citing was uncorroborated hearsay. That's the issue here, Your Honor. Whether it's hearsay? This is an evidence question? No. It's not. It's a weight question. The Board says, we therefore say it's hearsay, so they're not giving it a lot of weight. But Board counsel in its brief says that there are a number of Board cases with which I agree that the Board does give weight to hearsay if it's probative and corroborated. And what the Board says here is that we seem to accept the fact that it is hearsay. It's plainly probative, a very important point. Why does the union's organizing effort totally fall apart? And all they say is, quote, we give it little weight. No, they said it was uncorroborated hearsay, and for that reason we give it little weight. Well, the fact is that it's an abuse of discretion to say it was uncorroborated because it was corroborated. And in what way was it corroborated? It was corroborated in several respects. Roadhurst testified that the meeting didn't occur because nobody showed up, nobody was willing to come. That corroborates what they told him. The judge found that to be true, given the circumstances. And in this circuit, the judge's findings are part of the record, and that further corroborates it. And those two factors alone, and given the timing of the – given that Galindo was fired, the chief union supporter in the shop, given the fact that he's a good worker, the company's told him that. And the whole organizing effort falls apart. It seems to corroborate, if not demonstrate compellingly, that when nobody else will show up and participate in organizing, and Roadhurst says, I couldn't get people to come to meetings, some people would talk to me one-on-one, we couldn't get people together, that all corroborates the fact that these folks, the three other lead organizers, part of the team, now say we're not coming because we're afraid to lose our jobs, given the fact the employer's fired Galindo. That's the corroboration. Kennedy. Assume that it is corroborated, because I think there's a plausible basis for saying there's corroboration. What you've described strikes me as permissible description of corroboration. So, meaning, does that get you where you need to get? It gets me remand, because the board says, we therefore give it little weight. The board has to express, either say it gives it weight, as it does hearsay evidence, or no weight, because it isn't corroborated. So you're asking, in a sense, for nothing more than we say, listen, you've got to give you've got to attach significant weight instead of insignificant weight to the testimony of organizer James Roadhurst, and now you've got to reconsider? But there's more. But that's sort of the primary focus. It's the next. I don't recall this argument in the brief. Is this argument in the brief over the hearsay problem? Yes, because there's yes, because we argue about the hearsay, and the board responded in this footnote as to why. I mean in your brief to us. Is this part of your argument to us in the brief? I'm not. The answer is yes, because we relied upon this as. You have a section in the brief called. No, no, not a section called hearsay. But the board in this brief explained why the board could sort of ignore it, but the fact is the cases they cite expressly say that the board has a right to rely on it. And there's actually a more recent case that I'll give to the Court where the board that's called LTD Ceramics, it's 341 NLRB number 14, where the board expressly relies upon hearsay. The board majority relies upon a hearsay statement saying we recognize this as hearsay and uses that hearsay to find a critical fact to deny a bargaining order in a withdrawal of recognition case. So the board can't – the board does rely upon hearsay. And it's the next sentence that I think corroborates, not to use an inappropriate phrase, but says at most the testimony would only support a finding that a total of five unit employees were affected in any way. Well, that doesn't make sense, because if the three folks who were helping organize and no one else shows up at meetings and everybody else in the shop knows that the one guy who's out there passing out cards trying to get people to meetings is fired for no reason, and then from 2002 to 2005, the employer continues to take this argument that they had pretextual reasons for firing him, it's got to affect more than five. It destroys the organizing effort. And everybody in the shop knows that the lead organizer is fired because he was out there supporting the union and the employer had no reason except pretext to fire him. So I think that's – I think it's even more autistic not to know, number one, that Galindo was fired, and to have a very, very strong suspicion as to why. I mean, he's the lead guy. He gets canned. Up until that time, he'd been a perfectly satisfactory employee. I mean, that's two plus two makes four as far as I'm concerned. My point here is that the board's rationale just doesn't cut it. And it's possible they could explain this. And I'm not – I don't think this Court has the power to simply – I'm not asking for a bargain. I think it's got to go back to the board to reconsider. And this is further kind of – But here's my problem with that remedy. As I look at the board's behavior post-2004, it's going to reconsider it, write a slightly different order, and you're going to be exactly where you are now. Well, Your Honor, I will disagree for the following reason, that I have absolutely no sympathy for what the board's done to labor in the last five years. And at the end of September, they issued this torrent of really bad cases. If this goes back to the board, given the composition of the board and the fact that certain board members are leaving, we don't know when this case will ever get decided. I see. So you think you may get a different wave, and so – We may get new board members who will take a different look at this and reconsider it. And this is kind of – it's politics, frankly, in some sense. But, you know, we may get other board members that the current President will appoint who will take a different look at it. And this is kind of exacerbated by their kind of summary description on the next page of the decision saying, here we find that, as in the cited cases, the discharge and threat did not impact a significant portion of the bargain unit. Well, it seems to me, how can you argue that it didn't impact a sufficient part of the bargain unit when we have, you know, evidence that the organizing effort falls apart with the chief union supporter in a – it's not a tiny shop, but a relatively small automobile shop is fired, and then the employer goes to hearing on the Lindos firing and continues to assert this pretext in 2002, 2003, 2004, until the board reversed or the board affirms in 2005, and they settle it. I mean, the Lindo number went back. He got some back pay, and that's the end of it. I just want to point out that – Does the board have discretion? What's the board's discretion here in issuing a remedial bargaining order? There's a wide discretion. I don't think there's any dispute that in terms of remedial relief, fashioning a remedy as opposed to finding a violation, the discretion is broader. The problem with bargaining order cases is that, as all the circuits have looked at, you've got to explain your reasons for issuing bargaining orders because you're, in effect, ordering affirmative relief. The same, I think, is true here, that the employer has an – that the board has an obligation to explain at least satisfactorily to this Court why it can come up with the conclusion that firing the Lindo had little impact on the unit, where we've proven that, in fact, it had a tremendous impact, because – Well, what they said was we think these other remedies will be sufficient. They did because they said that. They couldn't see that the impact of firing the Lindo – That's their opinion. That's part of their discretion, isn't it? No. The discretion is whether the relief of a bargaining order, where they have the discretion – I agree they have wide discretion to grant it, but not on the basis they've done, which is that these incidents, particularly the Lindo firing, had impact on, to quote them in their buried footnote, that most likely – That's why I asked you at the beginning if you have any case that ever says that the board abuses its discretion when it denies one of these, and unfortunately you said you didn't – you didn't – No, I don't. You didn't look. No, I didn't look because I'm not aware of any and never look into these cases. I just am aware of all the cases where the courts have denied bargaining orders saying that the board's rationale isn't satisfactory. Do we have any cases either with NLRB or maybe even some other administrative agency where the court sends it back saying, well, the rationale that you gave is unconvincing? It's not that you can't come to the same answer, but you need to give us a rationale that's convincing. That happens repeatedly in board cases, and I can cite probably off the top of my head, let me put that, but all the D.C. Circuit cases involving bargaining order, XL Atmos and all the other cases are all remands to the board to further explain. The D.C. Circuit's had this problem for years where they've been dissatisfied with the board's explanation. And so they kept remanding cases until finally in more recent cases the D.C. Circuit said, we're just unsatisfied with the way the board handles our remands, so they've now taken it upon themselves sometimes just to deny the bargaining orders. Now, I'm not an expert in labor law, so this may be a silly question. I am familiar with the general doctrine in administrative law of sort of hard look. Does the hard look doctrine apply to NLRB decisions as well? Well, I'm not quite sure what you mean by the hard look. Well, that is to say it's an abuse of discretion if the administrative agency in rulemaking, for example, does not take a, quote, hard look at the record. And if the reviewing court is convinced that they ignored significant evidence of the record, mischaracterized significant evidence of the record, they don't order a specific result, but they send it back so the agency can take a, quote, hard look. It's just straight APA law. That's true for the board. And there is a Supreme Court case, which I can't remember now, which the Court said very clearly that the circuit courts don't have the power to enter remedies without remanding to the board to let the board make that decision as a matter of board and administrative law. Yeah. But what I'm asking is how — what supporting law do you have, not necessarily with the Gissel order, but more broadly, what supporting authority do you have for a reviewing court sending it back to the — to the board saying, you know, you totally fouled up your look at the evidence, and maybe if you — maybe if you wrote a proper order properly evaluating, you'd come to this answer, but you haven't — but you've messed up the evidence? Do you have cases like that outside the Gissel context? The last — yes. Yes. I can think of one case that I won in this Court recently called Champion-Holmes, which was a board decision. This Court affirmed most of the board order in an unpublished decision and remanded it to the board, and the board just recently issued a follow-up decision accepting the remand and changing its decision in remedying the case. It's called Champion-Holmes. This Court, in another case called St. Vincent Hospital, did the same thing. It was a case that I argued several years ago where the Court reversed the board's finding and remanded it for further proceedings, finding that the violation had been found. So it's a common practice to remand, again, because the Supreme Court in this old case said that the circuit courts don't have the power to, on their own, to determine the appropriate remedy. It's got to be given back to the board to do. Did you want to reserve your remand? Yes, I did. Thank you. Judge Timwin has a question. Should the board evaluate the likelihood of recurrences of unfair labor practices? As considered in this case, post-pardoning were unfair labor practices. And if so, how much weight should be given to those particular unfair labor practices? Well, that was the other half of my argument, which I never got to. The board traditionally does look at post-bargaining order conduct to see whether the unlawful conduct can be remedied. And in this case, you have not a lot, with one interesting exception. The board found that there was one further effort by the employer to interrogate one employee about union activity. That was the Frankenhorst incident in 2002. And they point out in a footnote that that incident alone wouldn't be sufficient enough, and I'm not disagreeing with that. But there's another thing that goes on in this case which the board notes but doesn't explain, and again is buried in footnote 20, where what happened was Judge Park issues her bargaining order decision in November of 2002. The employer takes an appeal, and then there's some incidents in 2002 where the employer makes unilateral changes which are refusals to bargain. And the employer at that point is sort of can do that and just runs the risk that the bargain order will be sustained. But there's something unusual. In early 2004, the board gets an injunction in the district court ordering Desert Toronto bargain in good faith with the union. It's called a 10-J injunction. So Desert Toronto, under penalty of the court order, under compulsion of the court order, bargains in 2004. The union files charges saying you're not bargaining in good faith. And that's Desert Toronto 3. That's the third decision. And the judge finds that they didn't bargain in good faith by delaying, by just being unavailable. Now, I take the position that that is further evidence that the employer is continuing to violate the Act, and the employees know it. And all the board says about this in footnote 28 in the last paragraph is we note that during the pendency of this case, the union filed additional charges, and the board The United States District Court granted the relief. And then, as more fully described in our decision of Desert Toronto 2, also issued this day, we only find 181. They don't comment on the fact that for six to eight months, as found in Desert Toronto 3, the employer is refusing to bargain, even though there's a court order. Now, I'm not here arguing they should have been held in contempt. That's a trickier, difficult question. I'm just arguing that you've got recurrence of the employer's intransigence found by a judge, even though there's a court order. But the board is aware of this. Yeah. But that's no explanation of why they're ignoring it. Simply to say we know about the injunction. And they decided that wasn't sufficient. I would agree if they said that. But all they said was there was an injunction. And they don't say anything more. They don't explain why that conduct for six to eight months found by the judge in Desert Toronto 3, the employer is refusing to bargain, doesn't impact the bargaining of the State. Galindo got fired in 2002. They continue to assert this pretext. 2004, a district judge orders them to bargain. They still can't bargain in good faith. Why should we ever want a union? Why should we vote for a union? I think that answers your question. Well, that takes me to another question of the day. A rather broader question. Is the ALJ's order only an advisory order? In other words, it's a recommended order to the NLRB, the board itself. So is the employer required to comply with the ALJ's recommended bargaining order? Or only the board's order? If and when it affirms and adopts all or a portion of the bargaining order? The answer is exactly as you phrased it. The judge's decision is a recommended decision, has no force, no effect. The employer is entitled to file what are called exceptions and appeal. And it's not until the board issues its final order that there is an order. It's a recommended decision. So when Judge Park issued her decision in November of 2002, I concede that if the company refuses to bargain at that point, that doesn't weigh one way or the other in my argument here. I think they have the right under the law to refuse to bargain. They run the risk that if the board affirms a bargaining order, their continued refusal to bargain, in this case between November of 2002 and 2005, would be further violations of the Act. But if the board doesn't affirm the bargaining order, they're off scot-free. So I'm not here arguing that Desert Charter II involves that problem. Desert Charter II were unilateral changes in 2002 and 2003, which would have been subject to the bargaining order. But I didn't argue that that conduct warrants a bargaining order later, because I understand that's the doctrine here. My argument is that you had a district court order intervening, which they refused to comply with and didn't bargain when there was an order to bargain. Well, that's a battle in the federal court. That would be disputed, probably initiated by contempt proceedings between the court and the employer and the board. Right. We're talking about the board and the ILJ within the context of the NRB proceedings. Well, but the board notices it in their decision, noting that this all happened, and then doesn't explain why. That isn't further evidence that this employer, Desert Charter, is still willing to not comply with the law because it doesn't comply either under compulsion of a district court order. Now, whether or not there's a final contempt finding, I'm not arguing. I'm just saying that there's this 8-month period where they delay and refuse to bargain. The judge finds it. And then, obviously, the board reverses it, Your Honor, because they say the underlying bargaining order, we're not affirming it. Judge Park's underlying bargaining order. But they don't deal with this problem that, in response to Herb's question, it shows a recurring effort by this employer not to comply with the law. Well, do you agree that if the ALJ's recommended order is rejected by the board, as in this case, there has not been an effective bargaining order which could have been violated by any alleged unfair labor practice, in theory, the bargain or other act of noncompliance? Exactly. I agree with that formulation that there are – that if you find Judge Park's recommended order not supported, and as the board did, then you really can't bootstrap and argue that conduct between November of 2002 and 2005, when the board's – December of 2005, when the board's decision is issued, can be used to support my argument. I can't bootstrap that. That's not an appropriate argument. But I can make – I can argue, just as the board did, that this problem of the intervening court order, which they didn't comply with, as far – again, the judge didn't find – Judge Metz in Desert 203 didn't find contempt. He just found they didn't bargain, even though it was a court order. The board notes it and doesn't explain why that isn't a factor in response to Your Honor's first question. Thank you. Thank you very much. Thank you. Good morning, Your Honors. May it please the Court, my name is Fred Jacob, and I represent the Labor Board. I'll be sharing time with counsel for the intervener, Mr. Rice, and we'd like to split it two-thirds, one-third, approximately 13 minutes and 7 minutes. Okay. Your Honors, as you've suggested, this case ultimately comes down to whether the board abused its discretion in declining to issue a Gissell bargaining order based on the facts and the unfair labor practices that it found were committed. The board asks the court to deny the petition for review and affirm its decision. The Steelworkers case that this Court issued earlier this year really does speak very much to the issues in this case. The Steelworkers case initially states in very clear language that the board's order declining to issue a Gissell should only be reversed if there is a clear abuse of discretion. And then the essential holding of that case goes directly to my opposing counsel's suggestion here today that the board is required to issue an explanation, an extraordinary explanation for not ordering the extraordinary remedy of a bargaining order. And Steelworkers, as Your Honor observed, makes clear that the board, when it orders only traditional remedies, is not required to issue or to explain itself in any extraordinary fashion. Instead, it's only required to explain itself in the same way it has to explain itself in any routine case, which is a reasonableness review to ensure that the board is acting within its discretion in fashioning remedies. Again, the board's discretion in fashioning remedies is extremely broad, and I believe the Supreme Court has stated, and we've noted this in our brief, that it's only to be reversed when the board's order seems to be a patent attempt to evade the contours of the act. And what we have here, ultimately, when issuing a Gissell, the board is required not to determine whether bad things happened, because in any case where it's fashioning remedies, bad things happened. An employer has violated the act. A union has violated the act. And Congress has given the board a set of remedies and a set of authority that it can wield to remedy those sorts of violations. Instead, what the board has to consider is simply whether a fair election is possible. And this is a Category 2 Gissell case where it, by its very nature, could go either way. This case involves, at heart, when the board reviewed all the decisions, at heart, again, some very bad actions. The employer here clearly discharged the leading union advocate. It interrogated other employees, and it maintained a no solicitation rule. But those are the sorts of violations that make up the bread and butter of the board's practice. In almost every case in which there's an organizing campaign, majority status could be impacted. And that's why Congress made these acts unlawful. So the remedies here were tailored by Congress to these particular violations. And the board explained why it felt a Gissell order was not appropriate here. And it's very detailed language that, given the size of the unit, given the fact that even at best, five to six employees of the 31-person unit were affected, given the fact that there was only one hallmark violation of the act, that traditional remedies, including Galindo's reinstatement, ensuring that all the employees know that Galindo was given an offer of reinstatement, his decision to go back was his alone, cease and desist order that acts as an injunction, and notice posting that allows all the employees to know that the company has acknowledged its wrongdoing, that the board found that that would be sufficient. I'm not sure, to be candid, which change in policy opposing counsel is suggesting occurred in 2004. To a certain extent, as his presentation made clear, we're fighting about the politics of the president's political appointments to the board. And I would suggest that even if you look at the cases we've cited and how they're distinguishable, the pre-2004 cases that we've cited or that the union cites in its brief, we've made clear why they're not on point here and that there has been no change in policy affected. Oh, come on. I'm sorry? Come on. Well, Your Honor, the board is entitled to change policy to some extent. You don't have to run away from the fact that it can do that. Well, Your Honor, I'm not suggesting that the opinions of the political decision-makers who are appointed to the board may be different than they were under a different administration. However, there's been no policy change of the sort, you know, a change in legal framework or doctrine. It simply is that the way administrative agencies work, they reflect the party in power and they reflect the prevailing political. Whenever anybody introduces an argument with candidly, as you did, there's trouble coming. I'm willing to accept the fact that under our system, and it's not limited to the board, administrative agencies can change their policies and they can do it by rulemaking or they can do it by adjudication. And it appears to me that there has been a shift in the board's willingness to enforce Gissel orders. So there we are. Rather to issue Gissel orders. Yeah. Well, it certainly is true that, you know, different board members might have different opinions about that. And I do think, though, that the board is, of course, in — is, of course, charged with acting rationally in these cases and that the cases that we have cited in our brief or the opposing counsel cites are distinguishable. And at the very least, it's certainly fair to say that these Category 2 Gissel cases turn on a very — Yeah, yeah. — a very tight axis. Let me ask you specifically with respect to steelworkers. Yes. I just reread it. And Judge Graber is quite clear in saying that there's a broad discretion and we're not going to interfere with the board's exercise of discretion in adopting the default remedy, which she calls not issuing the Gissel order. And she's very clear in saying that while courts have insisted on pretty clear explanations in support of a Gissel order, we're not going to insist on such a thorough explanation when it issues the default remedy, that is to say, not to issue the Gissel order. I mean, that in a nutshell is how I read Judge Graber's opinion. Of course, that's our circuit law, and there we are. But the argument, as I heard it, is a little different from sort of the tale of explanation. The argument being made on the other side is that the explanation is simply wrong in certain important respects. What if we were to conclude that, for example, the board's conclusion that the firing of Mr. Galindo had not that much effect, we discount the uncorroborated hearsay where he says, listen, he was fired on the 22nd of March and nobody came to the 24th, what if we were to believe that testimony and we were to say, you know, the board is just in fantasy land if it thinks that that firing was not directly causative of nobody shows up at 24. What do we do? If the court felt that way, I would suggest first that the board did consider, even if that you can the board, the board considered the fact that these three folks may not have shown up at this meeting. Nobody showed up. Not just those three guys. Nobody showed up. Well, at least the testimony from those three or the uncorroborated hearsay, the board said even considering that, we don't believe that that disseminated. If the court rejected the board's fact findings out of hand, which it would have to, the only way it could do that is by finding that no reasonable fact finder could come to this conclusion. That's the substantial evidence test that Congress put into the act itself. If the board finds that, if the court finds that the board was completely unreasonable, I would suggest that it should remand the case to the board to conclude or to reexamine whether a Gissel order is appropriate given the rejection of that fact finding. In any event, a remand would be necessary, and I'd like to point this out because Intervenor Council made some arguments in its brief that we would disagree with, that a remand would be necessary in any event if the court agrees that a Gissel order was appropriate. Because there are a host of other issues that would need to be resolved, not just all the unfair labor practices about refusal to bargain in Desert Toyota 2, 3, and 4, but also whether the unit itself was appropriate, whether the union made an appropriate bargaining demand, and an argument about whether time and changed circumstances would affect the appropriateness of the bargain. I noticed that the board accepted for purposes of argument that the bargain unit was proper, but did not in the end say yes or no. That's absolutely right, Your Honor. And along those same lines, all the unfair labor practices that allegedly occurred, the 8A-5s, weren't passed on. So as Your Honor suggested, there were a whole host of unfair labor practices that the ALJ, a number that the ALJ dismissed regarding the 8A-5s and refusal to bargain. There were a handful that she recommended finding, but the board didn't pass on any of those. And given that the board didn't pass on any of those. I'm sorry. I slipped a cog. This is not your fault. Did not pass on any of those. I missed you, Your Honor. What didn't the board pass on? I'm sorry. The board didn't pass on any of the refusal to bargain charges that were in Desert Toyota 2, 3, and 4. Oh, in the later ones. I'm sorry. In the later unfair labor practices. An employer acts at its risk by not complying in the interim pending a board decision, but it's under no obligation to do so. And once the board decides the ultimate issue, it's under no retroactive penalty for having not complied. And that's why, again, all those unfair labor practices that occurred after the bargaining order, the board didn't consider. Did the board consider that there was an injunction issued by the federal court that Toyota apparently completely ignored? Well, Your Honor, I think it's interesting. If you look at Desert Toyota 2, 3, and 4, it's unclear that the company's action was so flagrant. The ALJ herself or some of the ALJs found a number of these violations not to be violative and recommended dismissal of those portions of the violation. There were a handful of violations found, and I don't believe that the board considered it. The board, whether it issues a bargaining order or declines to issue a bargaining order, looks at the violations as of the time the order would have been, as of the time of the, looks at the propriety of the order as of the time of the violations. So the post-bargaining order activity wasn't reviewed, both because board policy is to look at it as of the time of the initial violations and because ultimately the board never passed on the merits of any of the violations, given that there was no bargaining order. So we don't know whether they would have been found to be violations or not. I'm also not clear whether the record shows whether a majority of the members of the bargaining unit wanted the union or didn't want the union or had signed cards or not. I don't think that's contested. I think it's been assumed that 16 cards were signed in the bargaining unit, fluctuated between 30 and 31 members. So under either count, the board assumed that a majority at some point before the unfair labor practices had supported the union. And those cards are in the record. I believe they're in the board's supplemental appendix. But as we made clear in our brief, that's a prerequisite to finding a GISL. There are lots of unfair labor practices that impact majority status, and the board uses traditional remedies to fix them. And the board just simply felt that this is one of those cases. I see I'm about to hit seven minutes, and I'd like to turn the podium over to Intervenor. Okay. But I'm happy to answer any other questions the Court may have before doing so. Thank you, Mr. Jacob. Thank you, Your Honors. Thanks. Good morning. Joel Rice on behalf of the Intervenor T. West Sales and Service Doing Businesses, Desert Toyota. I will just note that I was the one that brought the United Steelworkers' opinion to the attention of the Court. Obviously, the board's attorney has now addressed it at some length, so he's stolen some of my thunder since that was certainly one of the things I was going to mention to the Court. We do believe that decision is very important in terms of evaluating the propriety of the board's decision not to enforce a bargaining order under these circumstances. So I will just note a couple of other things relative to the chronology of this case from the employer's point of view. First of all, well, before I get to that, I'll just note, because I think Judge Silverman may have mentioned, is there any case out there that has reversed the board when it has refused to issue a Gissell bargaining order? And I believe that certainly the answer is the petitioner didn't cite any. And if you look at the cases the petitioner did cite in his brief, almost all of them involved cases where the board had agreed that a bargaining order should issue, and they were under circumstances that were far more egregious than the facts here. Typically, in almost every case where a Gissell order issues, you have had either a threat of a plant closure, an actual plant closure, multiple people being fired, inquiries into people's immigration status, threats of violence. If you go down the list of the cases that have been cited by the petitioner, there is no comparison between the facts of those cases and this case. I'm not saying there weren't. We're not contesting the findings here. But what do you make of the argument not that a Gissell order is compelled on these facts and that we should ourselves impose a Gissell order? That's off the table. But what do you make of the argument that the board has not properly characterized or maybe not properly understood the facts here and that we should therefore correct the board's understanding of what went on, send it back to them to decide yes or no as to a Gissell order based on what we tell them are the facts? Your Honor, from my perspective and my reading of the board decision, I don't see a basis, and this is also based on the board's own brief, I don't see a basis for concluding that the board didn't understand the facts. The board may have reached some policy conclusions based upon the facts, but I don't see any fundamental confusion on the part of the board. They simply looked at a set of facts and reached a policy judgment that was different than the policy judgment that ALJ Park reached. But that's their province. And, in fact, in the United Steelworkers case, it says whether a Gissell order is required is precisely the kind of narrow policy decision reserved to the knowledge and experience of the board. It made a policy decision, which it's free to do. Was it a policy decision or a judicative decision? Well, it's – obviously it's reaching a judgment, but it's not as if it said the sky is blue when the record was clear that the sky was gray. It noted certain things and reached conclusions about whether it felt that something was disseminated in the unit or whether it was – whether highest-ranking officials committed certain practices. It took note of all those things and simply reached a policy conclusion that it wasn't enough because – I think with good reason to footnote 18. And the board concludes, at most – and this is now just a factual conclusion by the board – at most, the testimony would only support a finding that a total of five unit employees were affected in any way by the Respondent's unlawful conduct. Well, that's a stretch in my view. We have 16 cards signed. We have Mr. Galindo fired on the 2nd of March. We have an organizing meeting called for two days later and nobody shows up. And yet the board appears to be saying, well, we think only five people were affected by the unlawful conduct. Well, Your Honor, I – That just doesn't make any sense to me. Your Honor, I respectfully disagree in this respect. If you look at the record, the last card that was signed – there were 16 cards signed. I think we all agree there were 16 cards signed. Now, we point out in our brief that we believe there's different context here that ALJ Park should have considered, which is that she sort of tortured a unit definition based upon a mixture of skilled and unskilled people. Yes, but for the moment, we're assuming 31. The board assumed that the ALJ found it. So we're stuck with 31 for now. I understand that, Your Honor. I'm not saying that we've appealed that unit determination, but I'm saying that – Well, there's nothing to appeal because the board didn't decide it. That's correct. The board neither decided it was good or bad. But my point is that the 16 cards signed were a very small fragment of the service department itself. They were 16 out of 30 or 31. So I got that. Next. But my point is this. The last card that was signed, the union petitioner has characterized this as some sort of inevitable juggernaut that was occurring that was then clearly and unmistakably derailed by Mr. Galindo's termination. And I think a reasonable person could conclude otherwise. And here's why. The last card was signed nearly a month before Mr. Galindo was terminated. There is no evidence that there were any meetings, face-to-face meetings, with anyone between February 25th and March, the scheduled meeting on March 24th. That's nearly a month. So our position is that the union's campaign, as it were, was losing steam anyway. And we believe a reasonable person could conclude that the failure of people to attend some later meeting, notwithstanding a few people's hearsay testimony that the board properly didn't consider, that the fact that people didn't show up for some meeting could be indicative that there was a general loss of interest, not that Mr. Galindo's firing. And what is the timing of the other unfair labor practices found by the ALJ? Were any of those, did any of those occur between February 25th and March 24th? Your Honor, they did, but I believe they were much closer to the termination of Mr. Galindo than they were to February 25th. But if your argument is the union movement within the bargaining unit was running out of steam, I don't think that's a complete argument until we figure out why it was running out of steam. And if it's running out of steam because not only because he's fired, but because of other unfair labor practices, how does that help you? Your Honor, my point is simply this, that the board has discretion to look at the facts and reach its own conclusions. And this Court, like any other circuit court, is only supposed to reverse if the board has made essentially a judgment that is so bizarre that it is counter to the purposes of the National Labor Relations Act. I think it's in the Peninsula Association case. Yeah, but we're not even being asked to reverse. We're simply being asked to remand for another look. Well, regardless of whether it's a reversal or a remand, the board's decision-making in this area is entitled to a great deal of deference. And besides which, Your Honor, and I just want to close with this because I realize I believe I'm past my time, and that is that this isn't a case where there's no remedy. There was a remedy. The employer was required to make a posting in a public, conspicuous place that it had violated the Act, that Mr. Galindo was being offered reinstatement, and that was posted for 60 days, and there's no dispute that the employer complied with that. So thank you, Your Honor. Thank you, Mr. Wright. Mr. Rosenfeld, you're way over your time, but we'll give you a minute in rebuttal. I don't want to call this rebuttal. I'll just conclude by saying that all we're asking for is a remand. Counsel's report is right. There are a lot of unresolved issues which could deprive us of a bargaining order because footnote 18 gives an explanation which I don't think passes the muster of blue sky versus gray sky or any other abusive discretion standard looking at the record as a whole. Thank you. Thank you. Mr. Rosenfeld, Mr. Jacob, Mr. Rice, thank you. The case just argued is submitted. We'll stand in recess.
judges: Silverman, W. Fletcher, Timlin